## MOORE v. THE CENTRAL RAILROAD COMPANY.

1. In an action brought by a plaintiff for an injury caused by the negligence of the defendant, the plaintiff cannot recover if it appears that the want of ordinary care or prudence on his part contributed to the injury, or that by ordinary care and prudence he might have avoided it.

2. It is not sufficient to show that the defendant's negligence conduced to the act from which the mischief resulted, it should also appear that the exercise of ordinary prudence and caution on the part of the plaintiff would not have prevented the accident.

This cause was tried at the Somerset circuit, before Justice Nevius, and a verdict was rendered for the plaintiff for two thousand dollars damages. The action was for injuries received by the plaintiff, who was a stage driver, by being run over by the cars of the defendants while driving his stage upon a public turnpike, where the same was crossed by the road of the defendants. The facts sufficiently appear in the opinion of the court.

The defendants obtained a rule to show cause why the verdict should not be set aside, and a new trial had.

The rule was argued before the CHIEF JUSTICE and Justices OGDEN and POTTS. Mr. *Scott* and Mr. *Brown*, for plaintiff; Mr. *Vroom* and Mr. *Frelinghuysen*, for defendants.

OGDEN, J. The issue joined in this cause was tried by a jury before Justice Nevius, at a Circuit Court in Somerset county, in December, 1851, and a verdict was rendered for two thousand dollars damages.

The plaintiff was the driver of a stage, plying daily between New Brunswick and Somerville. In making the trip up, on the 29th of March, 1850, with one passenger in his carriage, he came in collision with a locomotive and train of the defendants, which was also passing towards Somerville, whereby he was thrown from his carriage, and was much bruised and hurt; and the present action was instituted to recover damages for the injuries thereby sustained by him.

On the argument of the rule for the plaintiff to show cause why the verdict should not be set aside, and a new trial be granted, the defendants' counsel relied upon two principal grounds.

*First.* That the verdict should have been in favor of the defendants.

*Second.* That the damages were excessive.

In support of the first reason assigned, it was contended that the verdict is against the weight of the evidence, and that upon the proofs the plaintiff cannot in law sustain his recovery.

The consideration of this proposition leads to an examination of the nature and *gist* of the action, and of the grounds upon which a recovery should rest. It is an action of *tort*, which provides for an *innocent* plaintiff compensation in damages for injuries caused by the negligence or misfeasance of a defendant.

In *Harlow* v. *Hamiston*, 6 *Cowen* 189, C. J. Savage says, "negligence by the defendant, and ordinary care by the plaintiff, are necessary to sustain this action."

It is not sufficient to show that the defendant's negligence conduced to the act from which the mischief resulted; it should also appear that the exercise of ordinary prudence and caution on the part of the plaintiff would not have prevented the accident.

In 11 *East* 60, *Butterfield* v. *Forrester*, which is a leading case upon this subject, the plaintiff sought to recover damages for injuries received by him, in being thrown from his horse. It appeared that, for the purpose of making some repairs upon his house, the defendant had put a pole across a part of the public road adjacent to his building, leaving a free passage upon the other side. The plaintiff set out from an inn not far distant from the pole, just at candle-light, and while the obstruction could be seen for the distance of one hundred yards; he however, riding violently, did not observe it, but rode against it, and fell with his horse, and was much hurt.

Bayley, J., directed the jury, "that if a person, riding with reasonable and ordinary care, could have seen and avoided the obstruction, and if they were satisfied that the plaintiff was riding along the street extremely hard, and without ordinary care, they should find for the defendant," which they did accordingly. Upon the hearing of a rule to show cause,

the same justice said, "If the plaintiff had used ordinary care he must have seen the obstruction, so that the accident appeared to happen entirely from his own fault." Lord Ellenborough added, "A party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he do not himself use common and ordinary caution to be in the right. One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff."

The same doctrine is reaffirmed in 5 *Carr & Payne* 375, *Pluckwell* v. *Wilson;* 8 *Ib.* 373. *Wolfe* v. *Beard;* 9 *Ib.* 601, *Gill* v. *Brown;* 1 *Cromp. & Mees* 21, *Vennell* v. *Garner;* 3 *Meeson & Welsby* 244, *Bridge* v. *Gr. Junct. R. R. Co.*

In 10 *Meeson & Welsby* 546, *Davies* v. *Adams*, called the *donkey* case, the court say, "Negligence of a plaintiff, to prevent a recovery, must be such as that he could by ordinary care have avoided the consequences of the defendant's negligence. If by ordinary care he could have avoided them, he cannot recover."

The same principle has repeatedly been declared by the Supreme Courts in several of the states.

In 2 *Pick.* 62, *Smith* v. *Smith*, C. J. Parker adopts the doctrine of *Butterfield* v. *Forrester.*

7 *Pick.* 188, *Thompson* v. *Bridgewater*, Morton, J., observes, "If the attempt of the plaintiff's son to pass the causeway, under the circumstances of the case, was not only indiscreet, but amounted to gross negligence or rashness, the defendant should recover."

In the same case, Parker, C. J., says, "If there is not ordinary care, there must be negligence; and if there was negligence, to which the loss *might* be attributed, the *plaintiff* ought to bear the loss."

In 12 *Pick.* 177, *Lane* v. *Crombie*, the court say, "To enable a party to recover, he must not only show some negligence or misconduct on the defendant's part, but that the ac-

cident was not occasioned by his own negligence, in placing himself in a hazardous position without due precaution."

In 19 *Conn. R.* 571, *Beers* v. *Hous. Railroad Co.* "The rational rule, and that established by authority is, that the care incumbent on a plaintiff is that it must be *ordinary* care, as it is termed, which, as stated by Lord Denman in *Lynch* v. *Nurdin*, 1 *Adol. & Ellis N. S.* 36, means that degree of care which may reasonably be expected from a person in the plaintiff's situation. Reasonable care requires that in all cases the precautions should be proportionate to the probable danger of injury."

In the case of *Barnes* v. *Cole and Fitzhugh*, 21 *Wend.* 188, the action was brought to recover damages for an injury done by a steamboat to a scow, which was moored at a dock in the village of Oswego. Bronson, J., in delivering the opinion of the court, said, "The verdict is also, I think, plainly against the weight of evidence. I do not see how the plaintiff could escape the charge of having to some extent contributed to bring the mischief upon himself, by leaving his boat in an improper situation."

In *Brown* v. *Maxwell*, 6 *Hill* 592, which was an action prosecuted by one employee against the master, for injuries from the negligence of another employee, while the two were working together under a common foreman, Beardsley, J., in behalf of the court, says, "No man can in any case be allowed to recover a compensation for damages resulting from his own misconduct or negligence. A plaintiff suing for negligence must himself be without fault."

In the case of *Rathbun* v. *Payne*, 19 *Wend.* 399, a recovery was sought by the owners of one canal boat against the owners of another canal boat, for carelessly and negligently running down the plaintiff's boat, while navigating the Cayuga and Seneca canal, Bronson, J., in his opinion, remarks, "It is extremely doubtful, upon the evidence, whether the loss was not the result of negligence or misconduct on the part of the master of the plaintiff's boat. If both parties were equally in the wrong, neither can maintain an action against

the other. Indeed it has been said that a plaintiff suing for negligence must be wholly without fault."

Again he adds, " There must be a wrong as well as damage, and there is no *legal injury* where the loss is the result of the common fault of both parties."

In *Angell on Carriers*, § 556, 561, the subject is fully examined, and the same general principles are maintained.

In *Greenleaf on Evidence*, pt. 4, § 473, the author says, " Ordinarily every person is bound to use reasonable care to avoid or prevent danger to his person or his property. Whenever, therefore, the injury complained of would never have existed but for the misconduct or culpable neglect of the plaintiff, he cannot recover damages, but must bear the consequences of his own fault. Where both parties are in fault, the result of the authorities seems to be, that the burthen of proof is on the plaintiff to show that, notwithstanding any neglect or fault on his part, the injury is in no respect attributable to himself, but is wholly attributable to the misconduct on the part of the defendant, as the *proximate cause.*"

It is said by C. J. Tindall, in the case of *Davis* v. *Ganett* (a common carrier by water, who had deviated from his course), 6 *Bingham* 716, " that no wrongdoer can be allowed to apportion or qualify his own wrong." Upon the same principle, no plaintiff chargeable with carelessness and negligence can be permitted to apportion or qualify his own culpability, and to say the accident *might* have happened if he had been blameless. The rule would be different if the accident and damage *must* have happened if the act or omission complained of had not taken place.

A correct application of the evidence, given before the court and jury in the present case to the foregoing well established principles of law, must settle the question, whether the verdict is wrong upon the first ground taken by the defendant's counsel.

Each party, at the time of the collision, was in the exercise of a lawful right. The plaintiff was travelling upon a turnpike road established by legislative enactment. The company derived power from the same source to cross the turnpike with

their railroad track. They, also, are authorized to run their trains unrestricted as to motive power, speed, or time.

The fact is notorious throughout the country that the public exigencies of travel and of mail transportation demand and require from railroad companies the running of fast trains. The great desideratum with the passengers is speed, and so pervading is its influence that no restraint has, as yet, been put by law upon the rapidity with which public ordinary roads may be crossed.

The legislature require that *notice boards* shall be placed at all crossings, and, also, that a bell shall be rung, or a steam-whistle be sounded, for at least three hundred yards before a locomotive crosses a common road, under a severe pecuniary penalty, but no limitation is fixed to speed.

I do not mean to be understood as saying that ordinary care is not to be observed by persons having the management and direction of engines and cars used upon railroads, as well as by those who drive carriages upon ordinary highways. What should be determined to be ordinary or reasonable care, must depend upon the circumstances of the particular case. While companies are intrusted with the unrestrained use of steam power, they should exercise all reasonable diligence to prevent injuries to the persons and property of third parties. They are bound to provide skilful, sober, and prudent engine men, and, primarily, they are responsible for all negligence or omissions of their employees in fulfilling the requirements of law while engaged in their business, and also for their want of necessary skill.

If there *be negligence*, the company would be liable for all consequent injury to any one who had not deprived *himself* of his remedy by some default or misconduct on his own part.

If there *be wilfulness* on the part of an agent in the act complained of, the agent is personally liable, although the plaintiff may have been careless. But in cases of mere negligence, not so gross as to evince recklessness or design, *an action* cannot be maintained by *one, himself* clearly in the wrong. 2 *Zab.* 188, *Vandergrift* v. *Rediker.*

This principle does not conflict with the right of a passen-

ger to recover damages from a company for injuries received through the wilfulness or recklessness of their agents. *That* right springs from an implied contract on the part of the carriers to transport passengers safely, and they are held responsible for the conduct of those whom they employ to execute that contract. The carrier becomes answerable as a *contractor*, not as a *tort feasor*, by the wilful act of his servant, nor upon the presumption that he had assented to the act.

If the present plaintiff received the injury complained of through the negligent act of the agents of the defendants while engaged in the line of their employment, the consequence of which act could not have been avoided by the exercise of ordinary care on his part, the action has been supported; but if the evidence shows either that the plaintiff, knowing that the train was approaching the Middlebrook crossing, hastened forward to pass ahead of it, and mistook its distance or speed, and was run upon by the engine while upon the public highway, or that, in the exercise of the reasonable and ordinary care which is required of all travellers under such circumstances, and which calls for precaution appropriate to the probable danger of injury, he might have seen or heard the near approach of the train, and thereupon, by slackening or entirely checking the gait of his horses, he might have avoided the collision, then one important element was not established upon the trial, to wit, that there was no want of ordinary care upon his part.

Was it fairly inferrible, from the evidence, that the plaintiff saw or heard the near approach of the engine and cars? He was a daily traveller upon that turnpike, and knew that the upward train of cars daily crossed it at that point, and at or about that time. He had passed over the railroad track at Rockafellow's a few moments before, whence the train could be seen for a distance below the depot at Boundbrook. Between that point and the Middlebrook crossing, he was noticed by several persons as driving unusually fast. In front of Mrs. Jones', which is about two hundred and twenty-five feet from the place of collision, he rose upon his feet on the foot-board of his stage, and looked, in the direction of the approaching

cars, over to the railroad track, which was not more than one hundred yards distant.   This was testified to by three witnesses, observing him from different points, one from the opposite side of the track, the others from the same side of the track, but upon different sides of the turnpike, all of whom, in looking in the same direction with the plaintiff, saw that the train was near by.   A few yards further on (and opposite to Mrs. Mc-Nabb's house) he again rose up, looked in the same direction, sat down, and hurried his horses up an ascent in the road upon the crossing, where he was run upon by the locomotive, and received the injury complained of.

In the language of Justice Bronson, in the case of *Barnes* v. *Cole*, "I do not see how, under this evidence, the plaintiff could escape the charge of having, to some extent, contributed to bring the mischief upon himself" by approaching the crossing at such speed and under such circumstances.

It is true that Mrs. Feeney, the only passenger in the stage, and who has a suit pending against the company to recover damages for her personal injuries there received, testified that when the plaintiff stood up, and looked for the train at the two points already referred to, his horses were on a walk, and continued at that gait until the collision.   But she must, at least, have been mistaken, because, at the speed at which the train is said to have been driven, it would have passed from the place where Mrs. Jones and Mrs. McNabb and Mrs. House saw it when plaintiff first raised upon his feet and looked out across the turnpike some material time before he, driving on a walk, could have ascended to the crossing.   This inevitable result is sufficient to weaken the force of her testimony, independently both of her present relation to the company and the variance between her statements under oath and those which it was proved that she had made to several persons at and within a few days after the time of the accident.

If, as was contended for by the plaintiff, the engine was then driven at extraordinary speed, and no alarm was given, either by the bell or the whistle, yet, upon the view which I am led to take of the evidence, the accident must have oc-

curred, at least, from the common fault of both parties, *from which no legal injury can result.*

Again, assuming that the plaintiff neither saw nor heard the train, did he use that ordinary care which the circumstances of time, place, and hazard should require from a prudent man?

His rising twice upon his feet, and looking down the track, shows that he then expected the cars. If he did not see them or hear them while his stage was in motion, he certainly would have been warned of their near approach if he had stopped his horses at a proper and safe distance from the crossing. Mr. Vactor, who with a restive team of horses was farther up the turnpike, across the brook and beyond the school-house, heard the bell when the train was at Rockafellow's, and the whistle when it was near Mr. Fisher's tavern, above Rockafellow's, and also afterwards, as the train approached Middlebrook crossing. He also saw the stage coming up the ascent towards the crossing, as he supposed, at an increased speed. Now what would be reasonable precaution in one case, might not be such in others. What might be an exercise of sufficient care in driving a carriage on a common highway, and about to meet a carriage approaching upon another intersecting ordinary road, might be considered gross negligence if the intersecting road was a railway track on which cars were advancing, because of the velocity with which trains on railroads are usually propelled, and the comparative difficulty of controlling and checking their speed.

However well intentioned the driver of a train might be, it may be impossible for him to fetch it to a stand after discovering an approaching object, while that object could be kept off the track without difficulty.

In which ever aspect the testimony is taken, it shows either that the plaintiff knew that the cars were near by, and, in attempting rashly to pass in front of them, he received the injury, or that he was culpably negligent in not using that reasonable ordinary care and prudence which, in view of the probable danger of injury, self-preservation should have dictated, and which would have enabled him to have discovered

the rapid approach of the locomotive, and to have avoided the collision.

It was contended by the counsel for the plaintiff that all this was proper for the consideration of the jury, and that, by their finding, they have settled that the plaintiff was not in fault.

What constitutes negligence and reasonable care, I take to be a question for the court.

Whether the facts relied upon to establish the one, or to prove the exercise of the other, are true, is to left for the jury. 7 *Metc.* 274; 19 *Conn.* 571.

The objection raised against this verdict is, that examined and judged of according to the well established rules which govern the legal determination of the truth of a case, it is against the weight of the evidence.

The objection, I think, has been well taken, and I am of opinion that the verdict should be set aside, because it is against the clear weight of the evidence and against the law of the case, and that a new trial should be granted.

This conclusion makes it unnecessary for me to discuss the question of damages.

POTTS, J. This cause was tried at the Somerset circuit, and a verdict rendered for the plaintiff. The motion now is to set aside this verdict and for a new trial.

Although courts have undoubtedly a legal right, in the exercise of a sound discretion, to set aside verdicts which appear to have been rendered contrary to law or against the weight of evidence, or which are manifestly founded in mistake, *Hutchinson* v. *Coleman*, 5 *Halst.* 74 ; *Corlies* v. *Little*, 2 *Green* 377, 382; *Dewitt and Davison* v. *Vliet*, 1 *Har.* 356; *Beebe* v. *Bank of N. York*, 1 *Johns.* 555, yet where there is some evidence to support the verdict, and there is doubt whether the jury mistook the truth or the law, or whether, upon the whole, any injustice has been done, their discretionary power is rarely, if ever, exercised. *State Bank* v. *Holcomb*, 7 *Halst.* 198 ; *Washington Banking Co.* v. *King*, 2 *Green* 45 ; *Woodward* v. *Paine*, 15 *Johns.* 493 ; *Winchell* v.

*Latham*, 6 *Cowen* 682 ; *Douglass* v. *Tousey*, 2 *Wend.* 352 ; *Smith* v. *Hicks*, 5 *Wend.* 48. And in cases of *tort*, where the complaint is that the damages found are excessive, or where the issue has been found for the defendant, courts have generally been reluctant to disturb a verdict, unless some principle of law has been clearly violated, or enough appears in the case to show that partiality, prejudice, or intemperance in the minds of the jury must have existed to account for it. *Deacon* v. *Allen*, 1 *South.* 338 ; *Taylor* v. *Vanderveer*, 4 *Har.* 22 ; *Sargeant* v. ――――, 5 *Cowen* 118 ; *Feeter* v. *Whipple*, 8 *Johns.* 369 ; *Jarvis* v. *Hatheway*, 3 *Johns.* 181. But here the first question is, whether, upon the law and the evidence, the plaintiff has made out a case upon which he is entitled to recover at all ; and upon that question, I apprehend, the same rule applies in actions *ex delicto* as in actions *ex contractu*.

There is no evidence of any misdirection on the part of the judge who tried the cause. The charge does not appear to have been excepted to, and is not before the court. The inference, therefore, is that the jury were rightly instructed as to the law, and our duty is to ascertain what was the state of facts, as presented to the jury, and whether they were such as could justify the verdict ; if they are, I shall not be willing to disturb it on the ground of excessive damages.

I. And first, as to the facts.

It appears that the plaintiff was the driver of a stage coach, running daily on the turnpike road between New Brunswick and Somerville ; that the turnpike crossed the track of the company's railroad near the village of Boundbrook ; and that, on the 29th of March, 1850, while driving across this track, he was run down by the locomotive and train of the company, on its way towards Somerville, his stage broken to pieces, and himself seriously injured. For this the action was brought.

The evidence was very properly directed, as we shall see by and by, to the questions, who was in the wrong? the plaintiff? the defendants? or both? And if both, could the plaintiff, by ordinary care, have avoided the consequence of the defendants' negligence?

I say negligence, because the existence of any evil motive on either side is not pretended, indeed could hardly be presumed from any ordinary state of facts. It is scarcely credible that the driver of a train could be so lost to a sense of danger to himself or others as to run wilfully upon a stage coach, or that the driver of a coach should come purposely in contact with a locomotive in motion. The collision was doubtless accidental, and the fault, wherever it lay, was that of carelessness or negligence. But for these the action well lies.

The evidence is, that the stage and the train were, on the occasion, passing in the same direction *from* Boundbrook *towards* Somerville; that from *Boundbrook* station to the crossing where the collision took place is 4350 feet; from *Rockafellow's* crossing to the place of collision is 2150 feet; and the greatest distance of *the railroad from the turnpike between these two last points* is fixed at 262 feet. Following the turnpike from opposite Rockafellow's crossing, we have the *Morgan house* 220 feet, and the *McNabb house* 110, from the place of collision. These distances and points of observation are important in the examination of the testimony; and it is also an important fact, that from the McNabb house to the crossing the turnpike gradually ascends some four or five feet, and the track of the railroad near the crossing is higher than the turnpike.

From Rockafellow's crossing to the place of collision there are thirteen buildings between the turnpike and the railroad, which of course obstruct at intervals the view of the cars from the turnpike. These facts being fixed, we turn to the testimony of the witnesses of the transaction.

*Bartley Vactor* was at the time in the turnpike, on the *other side* of the railroad crossing, coming up on his way *to* Boundbrook. He says he heard the cars start, as it appeared to him, from Boundbrook, and saw them cross Boundbrook bridge; heard them ring the bell at Rockafellow's crossing; heard the whistle right away after; they sounded the whistle pretty much all the way up. Couldn't say the cars were coming very fast or very moderate; saw them slack up a little; saw something coming up the hill, couldn't tell whether it

was the stage or Pound's wagon; calculated the cars would pass before the carriage would come up certainly; the driver seemed to be hurrying up his horses a little; thought he saw one of the horses *stumble.*

*Isaac Voorhees* was driving on the turnpike *from* Bound-brook *towards* Somerville, same direction as Moore, and was about 200 yards behind the stage at the time of the collision, till which he had not noticed the stage. He saw the cars, as he came, cross the bridge, but heard no bell or whistle all the way up to the place of collision. His carriage had a top on, and he didn't look out.

Then we have three witnesses, who were close by the scene when the accident occurred.

*Mrs. Jones* was at the *Morgan house,* 220 feet from the spot. She says she saw the stage pass the house; Moore stood up on the front board of the stage, and looked out; she turned to the window, and saw the cars passing, and said, " Moore can't get over the track before the cars get there." After he looked out, he went faster than usual. After he passed the house he got up, and looked out again just before he began to raise the ascent (100 feet from the track); before she took her eyes from the cars, he began to go up the declivity.

*Jos. House* was at Mr. Morton's; he saw the cars before they got to the crossing. Walking across the room, he saw the stage; saw Moore raise up and look around, and supposed he saw the cars; he struck the horses, and drove on. He saw the cars at one window, and stage at the other. Moore rose immediately on hearing the whistle. He was just on the rise of ground before he got to the track; can't say whether he had got by the McNabb house, thinks a little past. Cars had not got to the Morgan house when he first heard the whistle; was about even with the Morgan house when the whistle blew.

*Mrs. McNabb* was at her house, 110 feet from the place of collision. Says she saw the stage pass, first noticed it opposite the Morgan house; she first took sight of the stage, and saw the cars between Tallmage's barn and the Morgan house. When the cars were opposite the Morgan house she heard the

alarm whistle. Moore looked out opposite the Morgan house and opposite her's, and then went faster.

Now, from this testimony, it is very clear that when at the Morgan house, 220 feet from the place of collision, Moore was looking for the cars; that at the McNabb house, 110 feet, he was looking for them again, and that he then *increased his speed*.

From Mr. Rockafellow's, Mr. Tallmage's, and Mr. Cammann's testimony, we learn that from the turnpike north of the Morgan house a train can be seen as far as Rockafellow's crossing, 2150 feet towards Boundbrook; that from the foot of the ascent, 100 feet from the track, one can see 150 yards down the track, and that half-way up, or 55 feet from the track, one can see, north of all the buildings, down the line of the railroad to Boundbrook depot, 4350 feet. If these are to be relied on as facts, and, being the statements of witnesses who speak from actual observation and measurement, they do not seem to be questionable at all, then it follows, beyond all controversy, that when Mr. Moore was looking out at the Morgan house and at the McNabb house, and passing with increased rapidity up the ascent to cross the track, the train must have been coming in full view of him. And the conclusion would seem to be inevitable, not that he did not *see*, but that he miscalculated the *distance* and *speed* of the train, or that, in consequence of one of his horses stumbling on the track, as Vactor thinks was the case, he was delayed a moment, and thus caught.

There was another witness, a participator in the consequences of the collision, *Mrs. Feeney*. She was a passenger in the stage at the time. She says, in her testimony, that she did not hear or see the cars before the collision; and contradicts the evidence of other witnesses as to Moore's whipping his horses, though she confirms that of Jones, McNabb, and House, as to his looking out for the cars while approaching the crossing. But her testimony upon the two first points is greatly shaken, if not entirely overcome, by the statements of four other witnesses, as to her account of the matter immediately after the accident occurred.

*Shaddock,* the conductor, says she told him she knew the train was coming, and that Moore knew it; that she asked him to stop; that he got up, looked out, and whipped up his horses.

*Mrs. Hendershot,* to whose house she first went, says she told her she begged Moore to stop, and he wouldn't.

*Barbara Bowman* was present, and confirms Mrs. Hendershot's statement.

And *Mr. Hendershot* testifies that she said she saw the cars, and told Moore to stop; and he rose up, and then went on; that she touched him on the shoulder; that she sat on the back seat of the stage, with the middle curtain rolled up.

This is the substance of all the testimony given at the trial by persons who were present, or near enough to witness the occurrence or its immediate attendant circumstances.

As to the *speed* with which the cars were going at the time of the collision, there is a good deal of evidence; and so in relation to the question, whether the usual *signals* were given, the ringing of the bell, and the blowing of the whistle. It is somewhat vague and contradictory. Some of the witnesses say they were going fast, unusually fast; some judged from seeing the train as it passed, some from hearing it only; the conductor testifies they were not going faster than usual at that place, and had no time to make up. So as to the bell and the whistle, some of the witnesses say they heard, and others that they did not hear, these signals. It is, however, the peculiar province of the jury to weigh conflicting evidence. Their verdict must be considered as their decision that there was negligence on the part of the defendants, and no other ground existed for such a charge except these two, of improper speed and failure to make the signals. These, therefore, are to be conceded as facts proved in the cause, for I cannot say that there was not sufficient evidence to warrant the jury in reaching that conclusion. Here, then, is negligence on the part of the defendants.

The next question, therefore, to be considered is, was there, also, negligence on the part of the plaintiff? For the principle is at this day too well settled to be questioned, that notwith-

standing it appears that the defendant was guilty of negligence, yet if the plaintiff, by the exercise of ordinary care, might have avoided the consequences of the defendant's negligence he cannot recover. *Butterfield* v. *Forrester*, 11 *East* 60; *Pluckwell* v. *Wilson*, 5 *Car. & Payne* 375; *Williams* v. *Holland*, 6 *Car. & Payne* 23; *Sills* v. *Brown*, 9 *Car. & Payne* 601; *Bridge* v. *Grand Junction Railway Co.*, 3 *Meeson & Welsby* 244; *Davies* v. *Mann*, 10 *Meeson & Welsby* 545; *Barnes* v. *Cole and Fitzhugh*, 21 *Wend.* 188; *Smith* v. *Smith*, 2 *Pick.* 621; *Angell on Carriers*, § 556–61.

Mr. Justice Nelson, in delivering the opinion of the Supreme Court of the United States in *Williams et al.* v. *Barret et al.*, 13 *Howard* 109, says, "A man is not at liberty to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he does not use common and ordinary caution to avoid it. One person being in fault will not dispense with another's using ordinary care for himself."

Now how stands the case upon the part of the plaintiff? We have already seen that he was the driver of a daily stage between New Brunswick and Somerville along the turnpike road; that on the occasion of the accident he was approaching the point where the turnpike crossed the railroad about the time for the train, and that he was looking out for, and expecting it; that whether he saw or heard the train before or not, when he got within 50 or 60 feet of the crossing, half way up the gradual ascent of the turnpike, it was certainly in full view, and he could have seen it, even if he did not hear it, by looking over his shoulder. This 50 or 60 feet he undoubtedly passed in full view of the train coming close upon him, for he just reached the track as the train caught him.

Here seems to be a strong *prima facie* case, at least of want of ordinary care on the part of the plaintiff. When he came directly in view of the train he is certainly chargeable with notice of its approach, and of the danger of attempting to cross the track. Could he not have stopped? Was there more danger in doing so than in going forward, or any danger at all? The grade of the road was *ascending*, which was a

favorable circumstance. Were or were not his horses familiar with the sight and sound of the train? He passed along and across the road every day, and at about the same time as the train. Here seem to be questions which go to the whole merits of the cause, and there is no answer to them in the evidence; nothing upon which the jury could form any judgment, nothing to weigh, nothing upon which to found the opinion that here was no want of ordinary care. In *Thompson* v. *Bridgewater*, 7 *Pick.* 188, the plaintiff lost his horse in a pond, by reason of a defect in the highway. He might, from an eminence in the road, have seen that the causeway, at a considerable distance, was flooded, but when he descended the hill, it was out of sight until he had proceeded so near that he could neither turn back nor go on with safety. It appeared that *then* he *used ordinary diligence in endeavoring to escape the danger*, but without success; and he recovered damages for the loss he sustained. But the plaintiff's difficulty here is, that he does not show that after he approached so near as to discover the danger, he used all ordinary care to avoid it. As the case stands, it would seem that he voluntarily and incautiously ventured the hazard, which a prudent man would have avoided.

It is contended, by the counsel of the plaintiff, that it is exclusively for the defendant, as part of his defence, to show that he, the plaintiff, was guilty of negligence, and might have avoided the mischief. But *Smith* v. *Smith*, 2 *Pick.* 621, *Lane* v. *Crombie*, 12 *Pick.* 177, *Parker* v. *Adams*, 12 *Metc.* 415, *Harlow* v. *Hamiston*, 6 · *Cowen* 191, 2 *Greenl. Ev.* § 473, are authorities to the contrary. These all hold the doctrine, that it is for the plaintiff to show this. I think some of these cases lay down the doctrine too broadly. I am not prepared to say that if the plaintiff proves the injury, and that it was caused by the negligence of the defendant, he must, in the first instance, go further, and prove *negatively* ·that he was guilty of *no* negligence on his part, or that, by ordinary care, he could not have avoided the consequences of the defendants' negligence; but if facts and circumstances appear either in the case made by the plaintiff, or that shown by the de-

fendant, upon which that question comes up in the cause, the *onus* is then thrown upon the plaintiff to show ordinary care on his part. Such facts and circumstances appear in this case. It is assumed, after verdict, that the plaintiff has shown the negligence of the defendants; it is clear that the injury was done, but it leaves unexplained a state of things from which the inference would seem to be inevitable, that by ordinary care the plaintiff could have avoided the mischief. Here the *onus* was on him.

But it is said, again, that this was a question for the jury; that they are the exclusive judges of what constitutes ordinary care, and that they, by their verdict, having passed upon it, this court ought not to interfere. It is the province of the jury to weigh evidence, and to determine its effect in settling the facts of a case; but the legal effect and operation of facts, when settled, is a question of law for the court. *Jackson* v. *Betts*, 9 *Cowen* 225; *Chesapeake and Ohio Canal Co.* v. *Knapp et al.*, 9 *Peters* 568. Besides, upon the question here, the question whether the plaintiff by ordinary care could have avoided the mischief, the facts are all on one side—uncontradicted, unexplained, they are against him. There is nothing in the other scale—nothing to weigh—and it cannot be admitted that juries may assume at their pleasure what ought to be proved.

True it is that where it clearly appears that the act of the defendant amounts to culpable wilful negligence, so gross as to furnish cogent evidence of an intention to do the mischief, courts will not put the plaintiff to the proof of care and diligence on his part to avoid it. *Hartfield* v. *Roper and Newell*, 21 *Wend.* 615; *Tonawanda Railroad Co.* v. *Munger*, 5 *Denio* 267; *Gardner* v. *Heartt*, 3 *Denio* 236; *Story on Bailments* § 19–22. But there is no pretence here that the act was intentional or malicious.

I entirely agree with the counsel of the plaintiff, that in this age, so prolific of change, when railroads have come to occupy all our great lines of travel; are extending themselves over almost every section of the country; coursing through our cities and villages and farms by day and night, and using, as

the motive power for their trains these uncontrollable machines capable of being propelled at tremendous speed, and which are always liable to be placed under the control of reckless and irresponsible agents, that courts are called on to exert all the power they possess in guarding the public from the danger incident to negligence in their use. The whole subject will probably, at no distant day, imperiously demand the interposition of legislative regulation; but until this is done, we can only apply to the cases of negligence the settled rules of existing law. The use of these engines as motive power is legalized, and we cannot separate from the use the incidents of rapid motion and impossibility of control. "Ordinary care," however, is a relative term. What would be ordinary care in sailing a vessel or driving a horse would not be ordinary care in driving a locomotive. The caution must be measured always by the probabilities of danger from the thing used, just as it requires more diligence and care to control a wild than a tame animal, a strong and vicious, than a weak and timid one. But this does not change the rule: for it is also true that in such cases superior caution must be used in avoiding the danger to amount to ordinary care. The increased liability to danger imposes on both parties the obligation to exercise increased caution. The law has not regulated the speed at which trains may pass across roads in the country, nor has it said that a failure to make the required signal shall render companies responsible for accidents irrespective of the care or negligence of parties injured. We sit here not to make, but to administer the law, and we must do so by existing rules. In this case, I am clearly of opinion that the plaintiff was bound to show that he used all ordinary care, all reasonable caution to avoid the collision : he has failed to do so; there was no evidence from which the jury could infer he did so, and for this reason I think the verdict must be set aside, and a new trial granted, upon payment of costs.

The CHIEF JUSTICE concurred.

AFFIRMED, 4 *Zab.* 824.    CITED *in Runyon* v. *Central R. R. Co* , 1 *Dutch.* 558; *Ashmore* v *Penn. Steam Towing & Tr.. Co.,* 4 *Dutch.* 185; *Telfer, Ad.,* v. *Northern R. R. Co.,* 1 *Vr.* 188.